Richard D. McCune (SBN 132124)
rdm@mccunelawgroup.com
Valerie L. Savran (SBN 334190)
vls@mccunelawgroup.com
**MCCUNE LAW GROUP, APC**
3281 East Guasti Road, Suite 100
Ontario, CA 91761
Telephone: (909) 557-1250

Dana R. Vogel (*Pro Hac Vice*)
drv@mccunelawgroup.com
Connor P. Lemire (*Pro Hac Vice*)
cpl@mccunelawgroup.com
**MCCUNE LAW GROUP, APC**
2415 East Camelback Road, Suite 850
Phoenix, Arizona 85016
Telephone: (909) 557-1250

*Attorneys for Plaintiff ML Products, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ML PRODUCTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BILLIONTREE TECHNOLOGY USA, INC., MOUNTAIN PEAK. INC., SHENZHEN YANGFAN TECHNOLOGY COMPANY LTD,, JIAN ZHOU, DING YAN, and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.: 2:23-cv-08626-MEMF-DTB<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. Violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*<br>2. Violations of California Bus. & Prof. Code § 17200, *et seq.*<br>3. Violations of Cal. Bus. & Prof. Code § 17500, *et seq.*<br>4. Civil Conspiracy |

NOW COMES Plaintiff ML Products Inc., with knowledge as to its own actions and events, and upon information and belief as to other matters, and alleges as follows against Defendants BillionTree Technology USA, Inc., Mountain Peak, Inc., Shenzhen Yangfan Technology Company Ltd., Jian Zhou, Ding Yan, and Does 1-25 (together, "Defendants"):

## I.

### NATURE OF THE ACTION[1]

1.      This is a case about unfair competition. Defendants, who are sellers of third-party printer ink and toner cartridges on the Amazon.com online sales platform, have successfully deployed numerous false, deceptive, unfair, or otherwise unlawful tactics in order to inflate their retail sales at the expense of sales by Plaintiff ML Products Inc., a competing third-party ink and toner seller. Third-party ink and toner cartridges generate an estimated $350 million or more in annual sales on Amazon. Sellers, including ML Products and Defendants, compete for those sales. Defendants, however, have dominated the market through their deceptive and unlawful actions as described herein, and ML Products Inc. has as a result been cheated out of millions of dollars in sales.

2.      Sales on Amazon are driven to an overwhelming extent by a product's placement among the relevant products in Amazon's organic search results based on keyword searching. As relevant here, consumers search Amazon for ink and toner compatible with their printer and then purchase a product from among those offered by sellers. The ink/toners offered in the search results typically include the Original Equipment Manufacturer (OEM) brand for the relevant printer along with third-party private label brands, such as those sold by Plaintiff and/or Defendants. Amazon uses an algorithm to prioritize the items offered in the organic search results for each keyword search. A limited number of products appear on the first page of search results and other competing products on sequential pages thereafter.

---

[1] ML Products filed its Complaint (Dkt. 1 in 2:23-cv-08626) as directed by the Court's September 28, 2023 Order entitled "Severance of Action" [Dkt. 148] in *ML Products v. Ninestar Technology Co., Ltd., et al*., No. 21-cv-1930-MEMF-KK. Factual allegations from ML Products' original Complaint [Dkt. 1]  in the aforementioned 21-cv-1930 action that are unaltered were alleged as asserted in the November 12, 2021 Complaint filed in 21-cv-1930. Unaltered citations were alleged, likewise, as they existed on the date the Complaint in *ML Products v. Ninestar Technology Co., Ltd., et al*., No. 21-cv-1930-MEMF-KK was originally filed.

Most shoppers never look beyond Amazon's first page of search results and most purchases are made from among the first few listings in the organic search results. A listing appearing at the top of the organic search results is, accordingly, critical to sales.

3.    Defendants' tactics, individually and collectively, are designed to manipulate Amazon's algorithm into artificially elevating their listings to higher priority positions in the organic search results for keywords relating to ink and toner. Defendants employ these tactics so that their products appear higher up and on the first page or pages of search results and thus garner greater sales while at the same time bumping down their competitors' products and thus decreasing their competitors' sales. These tactics have been successful. Academic research has demonstrated that Amazon rating manipulation has a large causal effect on sales.

4.    To achieve these inflated sales, which are made at the expense of honest sellers like Plaintiff, Defendants employ some or all of the following tactics:

- commissioning fake product reviews;

- compensating customers for product reviews or to change or remove negative product reviews;

- manipulating sales rank by accepting fake orders that Defendants themselves pay for;

- use of "ghost" accounts to manufacture the false impression of interest in or sales of products, to inflate product ratings, and/or to manipulate the "helpful" voting for (likely false) positive reviews of Defendants' products; and

- review "repurposing," including (i) reusing older product listings (and their accompanying review history) with new product offerings in order falsely to capitalize on past sales and review history for new products and (ii) "variation" manipulation achieved by falsely treating different toner and ink products as variations of a single offering in order falsely to share in the ratings, reviews, and status of each other.

5.    Amazon itself asserts that "fair competition in Amazon's stores depend[s]" on the "authenticity" of customer reviews, and that "[b]ad actors who pay for product reviews … compete unfairly" with honest sellers on the Amazon platform. Amazon labels undisclosed incentivized reviews

as "inherently false and misleading" and "likely to mislead customers into believing they are from unbiased and independent customers."[2]

6. Each of the tactics outlined above employs a deception to manipulate the Amazon algorithm, designed to elevate the product in question to a higher ranking and an earlier position in Amazon's organic search results. Used together, the tactics have an even greater effect—but even that is not the full extent of Defendants' deception.

7. Defendants exacerbate the impact of these deceptions by deploying them in combination with their use of multiple seller accounts that appear to offer competing products to the consumer. Defendants own, operate, and/or control multiple selling "brands," typically through an opaque web of sham business entities, so that they can occupy not just one of the top spots in Amazon's organic search results, but *multiple* spots. If a single spot high in the organic search results is valuable for generating sales (and it is), then holding multiple high spots is even more valuable. Through this practice, Defendants create the false impression that multiple sellers are competing to sell third-party toner or ink replacements compatible with the consumer's needs, when in fact, these straw-sellers exist only to crowd other potential sellers out of the top search result spots. With this tactic, Defendants falsely portray themselves as though they are a number of competing sellers for the same product (all of which employ the same ranking manipulation tactics), further enhancing their sales at the expense of honest sellers.[3]

8. All of these tactics violate Amazon's marketplace rules and seller contract. Defendants' actions constitute false advertising and/or unfair competition under the Lanham Act and other laws as

---

[2] *See* Complaint at ¶¶ 1-2 in *Amazon.com, Inc. et al. v. DOES 1-5, d/b/a Amztrustedreview.com*, No. 23-2-03317-5-SEA (Superior Ct. State of Washington, King County) (hereafter, "Amztrustedreview Complaint"), one of a number of lawsuits Amazon has filed against individuals and websites that it alleges sell fake review services to bad actors operating Amazon seller accounts.

[3] In its September 27, 2023 Order on motions to dismiss in the Ninestar action, 5:21-cv-1930-MEMF, the Court ruled that Plaintiff's claims did not assert actionable false statements insofar as they were based on allegations of Defendants' use of a "straw seller" strategy. Ninestar Dkt. 147. The Court later struck certain allegations from a subsequent complaint filed in the Ninestar action (the First Amended Complaint in the Ninestar action was filed after this action was severed). Ninestar Dkt. 182. Plaintiff acknowledges these rulings but respectfully leaves intact allegations concerning multiple seller accounts in this First Amended Complaint insofar as the allegations address alter ego and other important background context for the claims, insofar as they continue to be accurate allegations of fact, and in order to preserve all appellate rights in this action.

described herein. These actions have harmed Plaintiff ML Products Inc., which competes with Defendants for the sale of consumer replacement ink and toner cartridges. ML Products Inc. brings this action for monetary damages and disgorgement of Defendants' ill-gotten profits, along with enhanced or treble damages, preliminary and permanent injunctive relief, and recovery of attorneys' fees and costs of suit.

## II.

## PARTIES

### A.    Plaintiff

9.      ML Products Inc. ("ML Products") is a Los Angeles-based online distributor and retailer. Since 1999, ML Products has sold various kinds of toner and ink, making sales to wholesalers, retailers, and consumers. It is presently engaged in the online sale to consumers of replacement toner and ink cartridges on Amazon, where it competes with Defendants for sales. ML Products is organized under the laws of the State of California and its principal place of business is in Thousand Oaks, California.

### B.    Defendants

10.     Defendants, and/or entities under Defendants' control, account for a sizeable percentage of the third-party ink and toner sales on Amazon through use of the practices complained of throughout this Complaint.

11.     Defendant BillionTree Technology USA, Inc. ("BillionTree") is or was a business engaged in the online sale to consumers of replacement toner and ink cartridges on Amazon. BillionTree was organized under the laws of the State of California and had its principal place of business in the City of Industry, California. BillionTree owned, operated, and/or controlled, directly or indirectly, a number of ostensibly separate "brands" of replacement toner and ink which are still offered for sale in the United States on Amazon but now operated by Mountain Peak, Inc. BillionTree was dissolved on March 3, 2020, and Mountain Peak, Inc. took over as the business operating BillionTree's brands and shell companies. All allegations made against BillionTree in this complaint are also made against Mountain Peak, and vice versa.

12.     Defendant Mountain Peak, Inc. ("Mountain Peak") is a business engaged in the online sale to consumers of replacement toner and ink cartridges on Amazon. Mountain Peak is organized under

FIRST AMENDED COMPLAINT

the laws of the State of California and has its principal place of business in the City of Industry, California. Mountain Peak was incorporated in California on February 2, 2017 by Ding Yan (sometimes alternatively referred to as Yan Ding). Mountain Peak is the successor to BillionTree and now operates the BillionTree business. Mountain Peak owns, operates, and/or controls, directly or indirectly, the numerous BillionTree "brands" of replacement toner and ink which are offered for sale in United States on Amazon. These brands, including a number of shell corporations affiliated therewith, are alter egos of BillionTree and Mountain Peak. All allegations made against BillionTree in this complaint are also made against Mountain Peak, and vice versa. BillionTree, Mountain Peak, and these alter ego corporate affiliates and brands are related entities under common ownership and control and are all part of a common enterprise referred to herein as "BillionTree" or as the "BillionTree Group." The BillionTree Group accounts for an estimated $25 million in annual sales of third-party ink and toner on Amazon.

13.    Defendant Shenzhen Yangfan Technology Company Ltd. dba Sailing Technology (hereafter "Sailing Technology") is a business entity based in Shenzhen, Guangdong, China, which according to its website is "deeply engaged in the field of e-commerce and has witnessed the baptism of compatible printing consumables manufacturing industry." The website further specifies that its business includes dealing in "Consumables series" products, products which it depicts with an image of printer ink and toner. Sailing Technology's website affirms that through "third party sales platforms such as Amazon, the company has successfully entered the top three consumables e-commerce markets in the United States." Sailing Technology openly labels Mountain Peak, in "City of Industry, California, USA," as its "US overseas warehouse" on its website. Sailing Technology's president, Ding Yan, incorporated Mountain Peak in 2017 and is involved in the trademarking of various BillionTree Group inks and toners. Sailing Technology owns, operates, and/or controls, directly or indirectly, Mountain Peak and the numerous BillionTree Group "brands" of replacement toner and ink which are offered for sale in United States on Amazon. BillionTree, Mountain Peak, and these alter ego corporate affiliates and brands are related entities under common ownership and control of Sailing Technology and are all part of the "BillionTree Group" common enterprise. All allegations made against BillionTree, Mountain Peak, and Shenzhen Yangfan Technology Company in this complaint are also made against each of the others and against all other BillionTree Group members, and vice versa.

14.    On information and belief Defendant Jian Zhou is an individual residing in Walnut, California. Jian Zhou is Mountain Peak's current Secretary, CEO, CFO, Director, and agent for service of process. Jian Zhou previously served as Secretary, CEO, CFO, Director, and agent for service of process of BillionTree. Jian Zhou is also listed on several brand trademarks.

15.    On information and belief Defendant Ding Yan is an individual residing in Irvine, California. Ding Yan is the President of Sailing Technology and listed on several brand trademarks. Ding Yan also registered Mountain Peak in 2017.

### C.    Doe Defendants

16.    Doe Defendants 1 through 25 represent presently unknown corporate or brand affiliates, or straw sellers owned, operated, or controlled by BillionTree, Mountain Peak, Shenzhen Yangfan Technology Company, Jian Zhou, and/or Ding Yan who participate or participated in the BillionTree Group's schemes as described herein or as may be discovered during the pendency of this action.

### III.

### JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

18.    This Court has personal jurisdiction over the BillionTree Group Defendants by virtue of BillionTree and Mountain Peak doing business in this Judicial District and being headquartered in California. Jian Zhou and Ding Yan are domiciled in this district and also conduct business in this Judicial District through their ownership and employment with the co-conspirators, subsidiaries and/or affiliates, including at least BillionTree and Mountain Peak. Further, Sailing Technology engages in business in the State of California through its co-conspirators, subsidiaries and/or affiliates, including at least BillionTree and Mountain Peak.  Defendants have also engaged in statutory violations within the State of California and this District.

19.    Sailing Technology is amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint and one or more of them performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling third party ink and toner products on Amazon. Sailing Technology also regularly ships ink and toner products to the United

States, including to BillionTree and Mountain Peak at addresses in California and within this District. Sailing Technology has purposefully availed itself of the privilege of doing business in the state of California.

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Defendants have conducted, and continue to conduct, business in this District, and a substantial part of the acts and omissions giving rise to the claims occurred, at least in part, within this District. Defendants are headquartered here, maintain offices or facilities here, market, advertise, and sell the subject products here, and otherwise conducted extensive business, within this District.

**IV.**

**FACTUAL ALLEGATIONS**

**A.    Appearing at the Top of Organic Search Results Is Key to Retail Success on Amazon**

21.    Amazon is the world's largest online retailer, with a market share that far exceeds that of its competitors. Through its Amazon.com online platform, Amazon dominates the online retail sales market, controlling between 50-70% of all online retail sales in the United States. Amazon holds an even larger market share of multi-seller online retail platforms. Over six million independent, third-party sellers rely on Amazon's online retail platform to sell their own products. Amazon also hosts 1.7 million active third-party sellers from around the world,[4] about 32 times more than the 54,000 third-party sellers that Walmart.com hosts.[5] A 2020 survey estimated that about 37% of Amazon's third-party sellers, representing over 850,000 sellers, rely on Amazon as their sole source of income.[6]

---

[4] Number of Sellers on Amazon Marketplace, MARKETPLACE PULSE, https://www.marketplacepulse.com/amazon/number-of-sellers (last visited Sept. 30, 2021); see also Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 116th Cong. (2020) at 5 (statement of Jeff Bezos, CEO, Amazon.com, Inc.) ("There are now 1.7 million small and medium-sized businesses around the world selling in Amazon's stores.").
[5] Walmart's Fulfillment Service for Sellers Not Seeing Adoption, MARKETPLACE PULSE, https://www.marketplacepulse.com/articles/walmarts-fulfillment-service-for-sellers-not-seeing-adoption (last visited Nov. 12, 2021).
[6] The State of the Amazon Seller JUNGLESCOUT, (2020), https://www.junglescout.com/lp/brand/?utm_source=google&utm_medium=cpc&utm_campaign=JS-

22.     Most of the products sold on Amazon are sold by third-party sellers rather than by Amazon itself. In 2018, Amazon reported that customers spent $160 billion on items from third-party sellers, which was 58 percent of all sales on the site. More than 1 million sellers joined Amazon marketplaces around the world that year.[7] This growth in retail online shopping has only accelerated. Since the onset of the COVID19 pandemic, Amazon says that it has added 50 million Prime members and has made profits of over $26 billion, more than the previous three years combined.[8]

23.     In 2018, the *Washington Post* reported that more than half of all online product searches start on Amazon, citing survey data from the digital marketing firm BloomReach. As it concluded: landing among the first ten results on an Amazon search can mean "an explosion in sales."[9]

24.     When a consumer enters a keyword search in the Amazon search bar, Amazon displays a results list that contains "sponsored" results and "organic" results. "Sponsored" results are product listings for which the seller has paid Amazon to list the product in response to certain search keywords. Sponsored results typically appear at or near the top of the list. Consumers generally understand that sponsored results appear at the top of the list only because the seller has paid to have those listings appear there. Many consumers are thus skeptical of sponsored listings. Consumers have a strong preference for products listed in Amazon's "organic" search results. The organic results comprise a list of products that Amazon's algorithm believes will drive consumer sales. The algorithm returns a list of products related to the customer's search using, among other criteria, sales volume, sales conversion rate, and the products

---

DS-EN-USA-S_B-Brand&utm_adgroup=Jungle_Scout-EM&utm_term=jungle%20scout&utm_matchtype=Exact&gclid=CjwKCAiAvriMBhAuEiwA8Cs5lcbaQrN-rcLK2O9y32tEmRSZLvIX8AOdwtl03-NvOpVpOCW0vPY-OxoCXWEQAvD_BwE (last visited Nov. 12, 2021).

[7] Her Amazon Purchases Are Real. The Review Are Fake. (Nicole Nguyen Nov. 20, 2019) https://www.buzzfeednews.com/article/nicolenguyen/her-amazon-purchases-are-real-the-reviews-are-fake (Last visited Nov. 12, 2021).

[8] Fake Reviews and Inflated Ratings Are Still a Problem for Amazon (Nicole Nguyen. June 13, 2021) https://www.wsj.com/articles/fake-reviews-and-inflated-ratings-are-still-a-problem-for-amazon-11623587313 (Last visited Nov. 12, 2021)

[9] How merchants use Facebook to flood Amazon with fake reviews (Elizabeth Dwoskin and Craig Timberg. April 23, 2018) https://www.washingtonpost.com/business/economy/how-merchants-secretly-use-facebook-to-flood-amazon-with-fake-reviews/2018/04/23/5dad1e30-4392-11e8-8569-26fda6b404c7_story.html (Last visited Nov. 12, 2021).

FIRST AMENDED COMPLAINT

with a combination of the highest star ratings and the greatest number of star ratings. Each product is denominated by its own unique Amazon Standard Identification Number (ASIN) and accompanied by an average customer review rating of one to five stars and, usually, text and/or video or image product reviews purportedly authored by consumers who purchased the product.

25.     According to the *Wall Street Journal*, when people search for products on Amazon, almost two-thirds of all product clicks come from the first page of search results. Amazon's search system rankings can thus "make or break" a product, because Amazon's search bar is "the most common way for U.S. shoppers to find items online, and most purchases stem from the first page of search results, according to marketing analytics firm Jumpshot."[10] Indeed, according to a 2018 article published by Search Engine Journal, Amazon's own data concludes that:

- 70 percent of Amazon customers never click past the first page of search results;
- 35 percent of Amazon shoppers click on the first product featured on a search page;
- The first three items displayed in search results account for 64 percent of clicks; and
- 81 percent of clicks are on brands on the first page of search results.[11]

26.     Accordingly, for sellers on Amazon, it is critical to retail sales that the seller's product appear at or near the top of the list of results and on the first page. Most consumers will never look beyond that page.

27.     This is even more true in the market for third-party private label ink and toner sold on Amazon. Replacement ink and toner cartridges are sold on Amazon as both OEM-branded ink and toner and third-party, or private label, branded products. The OEM-branded ink and toner products—*e.g.*, Canon, Hewlett Packard, Brother, etc.—are compatible with the various models of name-brand printers that the OEMs sell.

---

[10] Amazon Changed Search Algorithm in Ways That Boost Its Own Products (Dana Mattioli. Sept. 16, 2019) https://www.wsj.com/articles/amazon-changed-search-algorithm-in-ways-that-boost-its-own-products-11568645345 (Last visited Nov. 12, 2021).

[11] Amazon's Search Engine Ranking Algorithm: What Marketers Need to Know (Loren Baker, Aug. 14, 2018), available at https://www.searchenginejournal.com/amazon-search-engine-ranking-algorithm-explained/265173/ (last visited Nov. 12, 2021).

28.     Replacement ink and toner is a lucrative source of sales for the OEMs. As OEM manufacturers introduce new hardware to the market along with compatible replacement ink and toner, third-party private label sellers race to keep up with replacement cartridges that are compatible with the new offerings.

29.     Although third-party ink and toner comprises hundreds of millions of dollars of sales each year on Amazon, there is very little basis beyond star and review ratings by which consumers can differentiate among competing brands of third-party ink and toner, unlike name-brand OEM ink and toner. For sellers of ink and toner, sponsored listings are generally considered to be a "loss leader," because the cost of sponsorship is greater than the profits one reasonably would expect to earn from the sponsored listings. For these reasons, consumers on Amazon choose from among third-party brands almost entirely on the basis of which ones appear first in the search results and which have the best star ratings. Oftentimes, consumers do not even recall the brand they chose after buying it. "Reviews are more important than a brand," says Fred Diman, CEO of Potoo Solutions, a firm that consults with ecommerce companies. "There's major brands that are being crushed by small direct-to-Amazon or direct-to-consumer brands."[12] It is this search priority ranking determined by the Amazon algorithm that Defendants have consistently manipulated in order unfairly to achieve sales on Amazon.

**B.      The Defendants Use Deception and Unfair Practices to Manipulate the Amazon Algorithm and Achieve Sales, to the Detriment of Plaintiff.**

30.     BillionTree Group uses a number of deceptive tactics to manipulate the Amazon search results algorithm and to falsely advertise their ink and toner replacement cartridges. Many of the tactics they have employed are common amongst the bad actors on the Amazon platform because of their effectiveness and have been documented by news outlets that report on these behaviors. Set out below are illustrations of some of these tactics, but the reality is that Defendants unleash an ever-changing barrage of deceptive tactics in order to game the Amazon algorithm. Round and round they go, and as soon as Amazon catches up to one black-hat tactic, Defendants switch to another.

---

[12] What Do Amazon's Star Ratings Really Mean?, available at https://www.wired.com/story/amazon-stars-ratings-calculated/ (last visited Nov. 12, 2021).

31.     One of Defendants' primary deceptive tactics is selling the same ink or toner disguised under multiple different brand names. Amazon permits a seller to list a product only once. But because Amazon allows other sellers to sell competing similar products, Defendants operate multiple selling accounts, under various different names, and use these accounts to sell the same ink or toner under different brand names. Defendants create the (deceptive) appearance of different sellers competing against each other for sales of the same third-party ink or toner product when, in fact, these purportedly different sellers form an interrelated web all operating for the benefit of a single enterprise. This deception provides each such enterprise (*i.e.*, the BillionTree Group) with a number of unfair advantages over honest sellers who follow Amazon's policies. By selling the same item under different brand names using different seller accounts, Defendants generate more opportunities for their products to land at the top of the organic search results. They also give themselves an opportunity to occupy more than a single spot in the search rankings, which simultaneously pushes down the listings of their actual competitors. Finally, these multiple listings permit Defendants to take greater risks in flaunting Amazon's policies, as the suspension of a single seller account will not eliminate all of the enterprise's sales under other seller accounts.

32.     Using shell companies and multiple brands to sell the same product creates the illusion of competition among these brands even though each sale is orchestrated by and for the benefit of the BillionTree Group. More importantly, though, this practice crowds out the listings of honest sellers: even if one BillionTree replacement ink cartridge deserved one spot at or near the top of the organic search results, each additional BillionTree offering at or near the top of the results pushes another honest seller's product lower in the organic results, where it becomes less and less visible to buyers and likely never to have the opportunity to win sales.

33.     Defendants further ensure that their multiple identical products rise to the top of the search rankings by using a number of different "cheat code" techniques intended to manipulate the Amazon algorithm into artificially awarding them priority in the organic search results. These deceptive tactics include: commissioning fake product reviews; compensating customers for favorable reviews or to change negative reviews; accepting fake orders or orders that they paid for in order to manipulate sales rank; manipulating the "helpful" voting for reviews; and review "repurposing," including reusing old

product listings with new offerings to falsely portray sales and review history for the new product and using false product "variations" in order falsely to share in the ratings, reviews, and status of each other.

34.     These tactics build upon and enhance each other. For example, by accepting orders that they have paid for, Defendants not only increase their sales rank, but also increase their conversion rate and decrease their return rate—metrics that Amazon tracks and uses to prioritize organic search results. The widespread use of fake reviews also artificially increases Defendants' conversion rate. Using these cheat codes in conjunction with their crowding strategy, Defendants artificially boost multiple different listings to the limited number of top spots in the organic search results, effectively shutting out of the market any seller not using these tactics. Unless Amazon punishes the cheating seller, the seller continues to benefit through high sales and honest sellers continue to be pushed unfairly out of the market. Ironically, the more this leads to actual sales, the higher the product is then rated and ranked in organic search results by Amazon's algorithm: a feedback loop fueled by deception.

35.     Following are examples of the BillionTree Group's deceptive and unfair conduct. These deceptions, by their nature, are designed to remain hidden and opaque. Only discovery in this lawsuit will lift the veil on the totality of Defendants' conduct.

### The BillionTree Group

36.     The BillionTree Group sells replacement toners and inks on Amazon for printer brands HP, Canon, Brother, and others. It does so through a group of corporate shell companies and brands that it owns and controls, including Shenzhen Yangfan Technology Company and ZhuHai MeiJiAn Trading Co., Ltd.

37.     Mountain Peak was registered as a corporation in 2017 by Ding Yan, who is also the president of Sailing Technology. Mountain Peak's current Secretary, CEO, CFO, Director, and agent for service of process is Jian Zhou. Jian Zhou previously served as Secretary, CEO, CFO, Director, and agent for service of process of BillionTree. BillionTree and Mountain Peak are registered to the same address, 19945 Harrison Ave, City of Industry, California 91789. For an overlapping period of time, they used that same address together, with Mr. Zhou serving in the foregoing roles at both companies. Additionally, the contact name on the trademark registrations for the 7Magic brand and the ONLYU brand (which formerly were BillionTree brands), Ding Yan is the same as the contact name on the Mountain Peak

trademark registration. When BillionTree was dissolved in March 2020, owner Jian Zhou continued to operate the various BillionTree Group brands and shell companies under the successor Mountain Peak. All allegations herein against BillionTree and/or Mountain Peak apply to the BillionTree Group, BillionTree, and Mountain Peak.

38.    Sailing Technology labels Mountain Peak, in "City of Industry, California, USA," as its "US overseas warehouse." The "contact us" page of Sailing Technology's website specifies that its "American branch" of "Mountainpeak Inc." is located at the 19945 Harrison Ave, City of Industry, CA address. Sailing's website also specifies that its business includes dealing in "Consumables series" products, which is illustrated on its website with an image of a Colorking brand printer ink and toner. The "about us" page on Sailing Technology's website further affirms that through "third party sales platforms such as Amazon, the company has successfully entered the top three consumables e-commerce markets in the United States[.]"

***BillionTree Alter Ego Sellers***

39.    The BillionTree Group sells or, in the time relevant to this action, has sold ink and toner on Amazon under at least eight different brand names. Each of these brands and their sham sellers are actually just alter egos of BillionTree, Mountain Peak, and Sailing Technology, created or acquired by it in order to offer the same product under multiple listings, thus crowding the field on Amazon and creating the illusion of competition for sales of those products. In fact, a sale of any one of those "competing" products is a sale by BillionTree Group.

40.    The ostensibly competing brands owned or controlled by BillionTree or the BillionTree Group include, at least, the following:

| 7Magic | Palmtree | CMYBabee | Greensky |
| HaloFox | ONLYU | Starover | Toner Kingdom |
| Mooho | Colorking | Tounker | Hotoink |

41.    Each of these brands is an alter ego of BillionTree, Mountain Peak, and Sailing. While the following relationships can be discerned through a public document investigation, the full scope of the practice can be ascertained only by discovery in this action.

42.    Shenzhen Yangfan Technology Co., owns the trademarks to 7Magic and ONLYU, both of which are BillionTree brands listed on Amazon.

43.    Shenzhen Yangfan Technology Co.,'s website depicts Colorking brand toner representing its "consumables series" business.

44.    The President of Shenzhen Yangfan Technology Company, Ding Yan, is the individual who incorporated Mountain Peak in California in 2017, and more recently  registered the trademarks for both Colorking and Mooho in 2020.

45.    Shenzhen Yangfan Technology Co. owns the U.S. trademark for the brands Palmtree and 7Magic, and the Chinese trademarks for the brands HaloFox, Greensky, CMYBabee, 7Magic, OnlyU, Starover, and Palmtree.

46.    Ding Yan is the contact person listed on trademark registrations for each of 7Magic, Office Helper, ONLYU, Mooho and Colorking.

47.    The U.S. trademark for Toner Kingdom is registered to Jian Zhou. Secretary of State records indicate that Jian Zhou is also the individual who signed BillionTree Technology's Articles of Incorporation, and also serves as its CEO, its agent for service of process, and signed its Statement of Business Information.

48.    The U.S. trademark for the brand Greensky is registered to Ying Zhou, c/o The Law Offices of Scott Warmuth, at 17700 Castleton Steet, City of Industry, California.

49.    The BillionTree Group offers for sale on Amazon toner replacements compatible with the Canon 045H under at least three different brand names: Greensky, OnlyU, and Starover.

50.    The BillionTree Group offers for sale on Amazon toner replacements compatible with the Canon PGI-280xxl and 281xxl under at least three different brand names: HaloFox, OnlyU, and Toner Kingdom.

51.    The BillionTree Group offers for sale on Amazon toner replacements compatible with the HP 414A under at least three different brand names: CMYBabee, Greensky, and HaloFox.

FIRST AMENDED COMPLAINT

52.     When a consumer searches for toner or ink on Amazon, the BillionTree Group shell companies and brands lead the consumer to believe she is choosing from among independently competing companies or brands. In reality, the choice is from among a large number of offerings of the same product sold by and for the benefit of BillionTree Group. No matter which of the "different" brands the consumer chooses to purchase, BillionTree Group wins the business and makes the sale.

53.     As detailed below, this deceptive use of more than one seller account is a violation of Amazon rules and provides an unfair advantage to BillionTree and BillionTree Group at the expense of honest sellers like Plaintiff.

54.     Despite BillionTree's attempts to conceal its ownership and control of the shell companies and brands, the corporate records pertaining to the shell companies, trademark registrations of the brands, and various public documents all lead back to BillionTree Group. BillionTree Group's purpose in creating these shell companies and brands is to falsely portray competition among numerous "sellers" and to crowd non-BillionTree sellers out of the search results, all while driving toner and ink purchases to BillionTree.

55.     On information and belief, BillionTree acts in concert with the other shell companies and brands under fictitious names within the BillionTree Group in order to engage in the conduct complained of in this Complaint. On information and belief, BillionTree is jointly and severally responsible for the conduct of the BillionTree Group complained of herein, including the conduct of the shell companies and fictitious brand entities, which it operates as a single enterprise by commingling resources, assets, operations, commercial activities, incur expenses and achieve profits jointly for the benefit of the combined enterprise, its owners and officers.

***BillionTree False Advertising***

56.     In addition to flooding the marketplace with brands, BillionTree also manipulates the Amazon search algorithms with incentivized reviews, fake reviews, or other tactics as described in this complaint. Examples of these tactics follow, but these are only examples of tactics Defendants use systematically.

1  Compensation to Change or Delete Negative Product Reviews

2       57.    A reviewer exposed the extreme lengths BillionTree is willing to go to manipulate

3  Amazon reviews, including over 30 emails exchanged with BillionTree (product Greensky ASIN

4  B07KXLWYQ3):



FIRST AMENDED COMPLAINT

So I respond asking if I can do anything to help her situation, contact labor relations, etc? Because like how do you respond to that kind of email??

She answered 3 minutes later that she appreciates my kindness and warm heartedness, and she has decided to quit. So I am her last customer. She'll get another job in a couple days.

WHAT ON EARTH??

I *thought* that would conclude this insane little trip into the Toner Mafia Underground. I posted on social media asking for thoughts & prayers for Alice, because wow poor Alice. My friends all print something out in Alice's memory and love of toner.

Then Ava emails me a week later saying she's Sophia's friend and how'd I like my gift card? Are you kidding me??

Alice then emails me a week later asking if I want a replacement or gift card refund for my faulty toner but can I change my review? (I had tried to update it but Amazon never put the revisions through.)

ALICE IS ALIVE?!

I say wow Alice, we were so worried about you, Sophia said you were gone and that your boss works you as slave labor. She replied that I was the sweetest person ever, they got rid of that boss, and she hopes to one day see me in person.

I now have over 30 emails exchanged with this bizarre company. I deleted that original 3 star review, hoping they'd leave me alone. I am re-reviewing it because I feel morally obligated to warn others against the Toner Mafia. But see, Sophia and Alice and Ava? I gave it 5 stars. So DO NOT EMAIL ME AGAIN.

What'd I get with the gift card? 1984 and The Testaments, because that seemed an appropriate way to honor Sophia, Alice, and Ava.

Anyway, curious why the ink has 5 stars? It isn't for longevity. Even after shaking the thing didn't last more than another 70 pages. It has 5 stars because anything less will put you in the eyes of the Toner Mafia.

4 people found this helpful

58.    Other reviewers disclosed that they were "hounded," "relentlessly harass[ed]" and "repeatedly contacted" by BillionTree to change their negative reviews (products ASIN: B07RSZNB8W and CMYBabee ASIN: B0828ZZSQL):



FIRST AMENDED COMPLAINT

59.    Other reviewers disclosed that they were hounded and "pressured" by BillionTree Group's TonerKingdom 7Magic and Starover brands to change or delete their negative reviews (products Starover ASIN: B07R9YWTD3; TonerKingdom ASIN: B07RQLJ94C; 7Magic ASIN B06XDMWZ7L).



FIRST AMENDED COMPLAINT



60.     One reviewer disclosed that they were contacted by BillionTree Group's Greensky to delete their 1-star negative review in exchange for a refund or replacement cartridge (product Greensky ASIN B07KXLWYQ3):

61.     Other reviewers disclosed that they were contacted by BillionTree Group's OnlyU and HaloFox to delete their negative reviews in exchange for a $30 Amazon gift card. (product ONLYU ASIN: B088B8KGBH; HaloFox ASIN:B082G93GXB):



62.     One reviewer disclosed that they were contacted by BillionTree Group's Palmtree to delete their 1-star negative review in exchange for a giftcard, specifically stating "This company offered me a $35 gift card if I changed my review. Shady business practice." (product Palmtree ASIN B087C3HC1N):

Ralph Schaefer
★☆☆☆☆ **Printer cartridges 62xl**
Reviewed in the United States on August 8, 2023
Verified Purchase
Returned these 62xl cartridges as they would not work in my Hp printer model hp envy 7645. The product description listed this model as one they would work in. Update to my review: this company offered me a $35 gift card if I changed my review . Shady business practice

Paid False Positive Reviews

63.     As discussed further in Section D below, on July 31, 2023, the FTC proposed Rule 465.4 which, "would prohibit a business from offering compensation or other incentives in exchange for, or

conditioned on, the writing or creation of consumer reviews expressing a particular sentiment, whether positive or negative, regarding the product, service, or business that is the subject of the review".[13] [14]

64.    Multiple reviewers also disclosed that they were contacted by BillionTree Group via letters in the mail and other means requesting 5-star reviews in exchange for Amazon gift cards. One reviewer also mentioned that they were directed "not to mention the gift card in [their] review," while another reviewer mentioned that she "got a letter mailed from seller and numerous emails asking for 5-star reviews in exchange for gift cards, money…" (product Starover ASIN B07R9YWTD3; Toner Kingdom ASIN B083BFPGD8; Toner Kingdom ASIN B08L34R6R3):



Amazon Customer
⭐⭐⭐⭐☆ **Toner is fine - soliciting 5 stars is not cool**
Reviewed in the United States on February 8, 2021
**Verified Purchase**
This toner worked just fine. It's not the same quality as OEM toner, so you'll need to be mindful of that if you're printing something where the colors need to be specific. I had to adjust the color settings on the machine to decrease the cyan, but it was fine once I fixed it.

I dislike being offered Amazon gift cards in lieu of a 5 star review. I *really* dislike being told "not to mention the gift card in your review." So, great toner, but cut it out with the pressure to award 5 stars.



CB
⭐⭐☆☆☆ **Don't buy**
Reviewed in the United States on May 30, 2022
**Verified Purchase**
The black cartridge only lasted a couple weeks after installing before print quality became poor. Not worth it. Don't trust the positive reviews. I was contacted by the seller shortly after purchasing offering a gift card in exchange for a positive review--this is unethical.

Zooey
⭐☆☆☆☆ **Does not work**
Reviewed in the United States on June 3, 2021
**Verified Purchase**
Took many tries inserting and taking out again for printer to not reject cartridge. Once it's in and useable, shows constant "low ink" message or "Error", which gets eliminated by turning printer off and on again, a pain to have to do. First cartridge stopped working after about 20 pages, shows low ink message, error or incompatible cartridge message. Second cartridge does same and wont work at all. I got a letter mailed from seller and numerous emails asking for 5 star review in exchange for gift cards, money so now I do not trust all the good reviews as genuine based on my experience.

---

[13] https://www.federalregister.gov/documents/2023/07/31/2023-15581/trade-regulation-rule-on-the-use-of-consumer-reviews-and-testimonials#p-319 . (Last visited Oct. 11, 2023).
[14]The FTC's proposed Rule 465.4 is important because, as alleged above, there are a number of individuals and websites that offer fake review services to Amazon sellers. In 2022, Amazon sued one such service, called Rebatest. Amazon alleged that the Rebatest website is "dedicated to the purchase and sale of fake reviews[,]" in which sellers agree to refund purchases made by reviewers and pay a fee in exchange for positive product reviews. *See* Complaint ¶¶ 5-7 in *Amazon v. Rebatest, Inc.*, No. 22-2-02588-3-SEA (Super. Ct. State of Washington, King County).  Amazon alleged that Rebatest's "entire business model is based on allowing sellers to obtain fake reviews and inflated ratings" for products in Amazon's stores and that Rebatest "actively deceiv[es] Amazon's customers[.]"*Id.* ¶ 9. As noted above, Amazon contends that customer trust and fair competition in Amazon's store depend on the "authenticity" of product reviews, and those who pay for product reviews "erode customer trust" and "compete unfairly" with honest sellers. *Id.* ¶ 1.

FIRST AMENDED COMPLAINT

65.    Other customer reviews reveal that BillionTree solicits positive reviews by offering Amazon gift card in exchange for writing positive reviews (product OnlyU ASIN: B078S36ZDM; Palmtree ASIN: B087C3HC1N; Palmtree ASIN: B087C3J9GH):



66.    Two reviewers disclosed that they received letters in the mail from BillionTree offering gift cards in exchange for 5-star reviews. One of those reviewers also mentioned that BillionTree's letter stated she "wasn't allowed to tell anybody about the offer" because "she was selected as a 'special handpicked reviewer'"(product Starover ASIN B07R9YWTD3; Starover ASIN: B078YQN619):



FIRST AMENDED COMPLAINT

67.     Shortly before the filing of the November 12, 2021 Complaint in *ML Products v. Ninestar Technology Co., Ltd., et al.*, No. 21-cv-1930-MEMF-KK, BillionTree sent a reviewer instruction to provide a video and a review for a "promo" (ASIN: B09D6Z8PPY):



68.     Another reviewer disclosed that he was offered an Amazon gift card in exchange for writing a review of Greensky's 202X Toner (ASIN B07QCT5WPB). Specifically, the reviewer stated that BillionTree brand Greensky "will offer you a gift card if you write a review of their product."



69.    Again, these are only examples of systematic practices. As further detailed below, Amazon does not permit sellers to incentivize or compensate purchasers for reviews of the seller's products. In fact, Amazon does not even allow sellers to communicate with purchasers outside of the Amazon messaging platform, which does not share customer contact information. By communicating directly with customers BillionTree has circumvented Amazon rules. By offering to compensate customers for favorable reviews (or for removal of negative reviews) BillionTree further violates Amazon rules and falsely advertises its products.

70.    These are not the only indicia that BillionTree has systematically used false ratings and reviews or otherwise manipulated the Amazon algorithm. Another leading indicator relates to the statistically inexplicable volume of reviews and elevated product ratings enjoyed by Defendants' products on Amazon.

71.    OEM-brand replacement ink/toner typically is the top-selling brand for any given printer. That is, not surprisingly, Hewlett-Packard brand inks typically lead sales on Amazon for replacement ink compatible with Hewlett-Packard brand printers—and frequently by a significant margin. Despite these greater sales (and thus greater opportunity for reviews), however, the volume of reviews and product ratings for BillionTree's competing third-party ink and toner products frequently outpace the OEM offering by a statistically unexplainable margin.

72.    Reviews and ratings for Hewlett-Packard's CF258X ink (compatible with a number of HP OfficeJet printers) are illustrative. Amazon sells the OEM-brand HP CF258X ink (ASIN: B07QZ4Z3X9), while BillionTree's Greensky sells the compatible third-party private label HP CF258X ink (ASIN: B09D6Z8PPY). Greensky has sold 159 units on Amazon as compared to the OEM brand, which has sold 46,321 units. Despite the OEM-brand replacement having *300 times* the amount of sales, Greensky has managed 33 positive reviews on Amazon while the OEM-brand has only 30 positive reviews.

73.    According to the consumer rights group "Which?", the existence of an unusually high number of reviews relative to other products in a category is indicative of review manipulation. Other red flags include reviews containing images and video, "a common request from sellers who incentivize

positive reviews," overly positive reviews and ratings, and reviews posted en masse at or around the same time.[15]

Repurposing Product Listings

74.    Another way that BillionTree uses false statements to manipulate the Amazon algorithm is through review "repurposing." This includes both (i) reusing older product listings (and their accompanying review history) with new product offerings in order falsely to capitalize on past sales and review history for new products and (ii) "variation" manipulation achieved by falsely treating different toner and ink products as variations of a single offering in order falsely to share in the ratings, reviews, and status of each other.

75.    Variation manipulation involves creating false "variations" of high-selling or well-established products under a single product ASIN in order to take advantage of the ratings, reviews, and any "#1 Best Seller" or "Amazon's Choice" badges of those high-selling or well-established products. The Amazon variation relationship is designed for linking products such as different sizes or colors of a single shirt, or a single dietary supplement that comes in 100- or 200-count bottles. In those situations, it makes sense that each "variation" would share in any Amazon badges and in the total number of ratings and reviews and the average star rating for all the products in the variation relationship. By contrast, the Federal Trade Commission has explained that including unrelated products as variations in order to "borrow" the ratings and reviews of the top-sellers for new or different products is "false and misleading," and amounts to unfair or deceptive acts or practices and false advertising in violation of Sections 5(a) and 12 of the Federal Trade Commission Act.[16] Once the false product "variations" have taken advantage of the "borrowed" ratings and reviews of the better-selling product to which they are linked, they often are de-linked but continue to benefit from the reviews and ratings falsely attributed to them.

76.    BillionTree engages in extensive variation manipulation. Each product unfairly benefits from inflated sales rank, number of reviews, and ratings on the Amazon sales platform. While not

---

[15] How to spot a fake review (Hannah Downes. Sept. 14, 2021) https://www.which.co.uk/reviews/online-shopping/article/online-shopping/how-to-spot-a-fake-review-aiDaS3e1ivfr (Last visited Nov. 12, 2021).
[16] *See* FTC's Complaint at ¶¶ 4, 12-13, 23-25 in *In the Matter of the Bountiful Company*, 2023 WL 2182055 (F.T.C.).

exhaustive, the following examples are readily discernible on Amazon and BillionTree engages in this
"false and misleading" practice across numerous product offerings.

77.    Amazon's product page for BillionTree's Greensky brand "414A" toner and "65XL" ink
toners show variation splitting with these two toners linked under a single product page despite being
unrelated ink products servicing different HP Color LaserJet Pro and Deskjet printers (highlights and
circling added):





78.    Amazon's product page for BillionTree's Starover brand "MLT-D111S Black" toner (ASIN B075M8YX5N) and "045H Color" ink (ASIN B078YQN619) toner show variation splitting with these two toners linked under a single product page , despite being unrelated ink products servicing different Canon and Samsung printers (highlights added):



FIRST AMENDED COMPLAINT

79.     Amazon's product page for BillionTree's HaloFox brand Brother TN660 (ASIN B08NDHQ3D4) and Brother TN660 (4-Pack) (ASIN B08NDGVFCY) show variation splitting by also including the unrelated Canon 305X/312X toner (ASIN B0855HR86P) linked on the same product page despite servicing a different printer brand (highlights added):



80.     BillionTree brand Toner Kingdom sells remanufactured ink cartridges that inclues at least variations 17 different types of inks combined together so they all have the same reviews. Each product shares the benefit of increased sales rank and  the same 16,882 reviews, despite different dates and years when each became available for sale on Amazon. BillionTree brand Toner Kingdom lists the ASINs for the 17 completely different products as variations: Canon 245XL/246XL (ASIN B0SY6DHW6R); Canon PG-245XL (ASIN  B09DSSN5TN); Canon  054H (ASIN BOS3BFPGD8); Officejet  952XL  (ASIN B09BVMRJ8D);     Brother     TN760     (ASIN     B0SCDFFV67);     Canon     280XXL/281XXL     (ASIN B08211HQB6); Epson 212XL (ASIN B09789F42X); Canon 305X/312X (ASIN B0725FRB7B); Canon 275XL/276XL (ASIN B0BTNKVNC6); Canon  055H (ASIN B09293HWPV);   HP 63XL (ASIN B0SL35998Z); Canon 051H (2-pack)(ASIN  B00SF258BL1); HP 30A (2-pack) (ASIN B08F283Y79); Laserjet 78A (4-pack)(ASIN B00WIGEKJQ); EcoTank 502XL (ASIN B09GLZBGG1); Canon 046 (4-pack) (ASIN B0BWLW47F8); HP 30X (ASIN B0C6EWXFJ3Y). Two examples of these 17 variations are illustrated below (highlights added):

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIRST AMENDED COMPLAINT

81.     BillionTree brand Greensky lists at least 6 ASINs for completely different products as variations. Each product shares the benefit of increased sales rank and  the same 2,487 reviews, despite different dates and years when each became available for sale on Amazon: HP OfficeJet Pro 962XL (ASIN  B0BTHDWV7C); Canon 137 (ASIN B07YW4NN4J); Canon 054H (ASIN B08SK4CCZV); HP 58X  (ASIN  B0SD6Z8PPY);  HP  414A  (ASIN  B08294JTZY);  Samsung  CLT-404S  (ASIN B07JBK4PK9). Two examples of these 6 variations are illustrated below (highlights added):





FIRST AMENDED COMPLAINT

82.     BillionTree brand CMYBabee lists at least 6 ASINs for completely different products as variations. Each product shares the benefit of increased sales rank and  the same 2,674 reviews, despite different dates and years when each became available for sale on Amazon: Laserjet Pro 26X (ASIN B0C274TF55); HP 206A (ASIN B0BZP2WK7Z); HP 206X (ASIN B0BX3WK3FC); HP 202X (ASIN B07YHG8L3F); HP 94A (ASIN B07XNYQZ7G); HP CF283A (ASIN B06ZYSFLLL). Two examples of these variations are illustrated below(highlights added):



83.     BillionTree brand Palmtree Image sells replacement ink for OfficeJet Pro 910XL (ASIN: B0C4FH5Q9G), yet there are questions and reviews for a completely unrelated product Brother ink cartridges that pre-date the May 5, 2023 first available date for the 910XL ink. This demonstrates that the ASIN has been repurposed (highlights added):



84.     When a variation filter is applied to this listing only 17 of the 278 reviews belong to the listed 910XL, while the rest belong to other products (highlights added).



85.    BillionTree brand ONLYU Image sells replacement ink for HP Color Laserjet Pro 414A (ASIN: B09GBDV4TM), yet there are questions and reviews for a completely unrelated Samsung and Canon ink cartridges. This demonstrates that the ASIN has been repurposed. (highlights added):



86.    BillionTree's acts are false and have deceived consumers. As a result of these acts, ML Products Inc. has lost sales of competing products.

87.    Through the conduct described herein, BillionTree and its controlled brands and shell companies sell on the order of $25 million per year worth of replacement ink and toner on Amazon, accounting for approximately 7 percent of the market for same.

**C.    Defendants' Unfair Competition Inflates Their Sales at the Expense of Honest Sellers**

88.    As set forth throughout this Complaint, Defendants use deceptive practices to market and sell their products, including: crowding the field with multiple alter ego seller accounts; false product reviews; compensated or incentivized product reviews (including compensation for removal or change of negative reviews); ghost accounts to show false product interest or sales, and to inflate product ratings; and review repurposing via recycling old product listings to falsely portray an existing sales and review history for new products and creating false product "variations" to share in ratings, reviews, and status.

89.    Defendants engage in this deceptive conduct, in short, because it works. They know that review volume and content are critical to sales on Amazon. According to seller consultant Chris McCabe, a former Amazon employee, a product with a lot of reviews is more likely to appear on the first page of

keyword search results.[17] *The Markup* reports that after price and shipping, the number of product reviews is the single most important purchase-driving factor for Amazon shoppers, citing a 2020 survey conducted by e-commerce firm Tinuiti.[18]  72. Seller consultant McCabe further notes that sellers "need quantity [of product reviews], or they start dropping in sales rank." A product with a lot of reviews is more likely to appear on the first page of keyword search results, according to McCabe.[19] The *New York Times* has likewise concluded that review "volume" can make a big difference in a product's sales.

90.    Review content is likewise critical to sales. A 2020 PCMag survey found that 78% of US shoppers who planned to buy tech products on Amazon Prime Day that year agreed that Amazon product reviews play a big role in their purchase decisions.[20]

91.    Defendants know that their fastest route to occupying the top search results is to pile up positive reviews and make sure that any legitimate negative reviews are neutralized or deleted.

92.    An expose by BuzzFeed News looked closely at the "Fake Review Economy" on Amazon, concluding that product reviews are a seller's best chance to stand out in the crowded marketplace. Citing survey data in which fully 87 percent of consumers said a positive review confirmed their decision to purchase a product, the authors concluded that "The best way to make it on Amazon is with positive reviews, and the best way to get positive reviews is to buy them."[21]

93.    Reviews are, in fact, for sale. A number of "black hat" companies offers sellers of Amazon products in the U.S. a menu of tactics designed to manipulate Amazon's ranking system to promote products, according to BuzzFeed. For instance, one company simply charges sellers "as much as $10,000

---

[17] Here's Another Kind Of Review Fraud Happening On Amazon (Nicole Nguyen. May 29, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-review-reuse-fraud (Last visited Nov. 12 2021).

[18] Is This Amazon Review Bullshit? (Jon Keegan. July 21, 2020) https://themarkup.org/ask-the-markup/2020/07/21/how-to-spot-fake-amazon-product-reviews (Last visited Nov. 12, 2021).

[19] Here's Another Kind Of Review Fraud Happening On Amazon (Nicole Nguyen. May 29, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-review-reuse-fraud (Last visited Nov. 12 2021).

[20] How to Spot a Fake Review on Amazon (Jason Cohen. June 21, 2021) https://www.pcmag.com/how-to/spot-a-fake-review-on-amazon (Last visited Nov. 12, 2021).

[21] Inside Amazon's Fake Review Economy (Nicole Nguyen. May 7, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-fake-review-problem (Last visited Nov. 12, 2021).

a month to help Amazon sellers appear at the top of product search results. Other tactics to promote sellers' products include removing negative reviews from product pages and exploiting technical loopholes on Amazon's site to lift products' overall sales rankings." Consultants offer "thumbs-up" clicks on a product review (suggesting the review was helpful), removal of negative reviews, or other services which help increase the overall star rating for a product. Black hat consultants offer to obtain customer email addresses for sellers so that sellers may contact them directly—which is against Amazon rules. As BuzzFeed notes, such offerings "make it harder for Amazon sellers who abide by the company's terms of service to succeed in the marketplace, and sellers who rely on these tactics mislead customers…."[22]

94.    One seller told BuzzFeed that before he engaged one of the black hat consultants he would barely break even on sales because the cost of advertising on Amazon is so high. He now makes about $3 million per year in net profits, but before he used the consultant's services he was making $73,000 per year.[23]

95.    According to the *Wall Street Journal*, "click farms that manage thousands of Amazon accounts" have proliferated. "In China, for example, some secretive businesses rent or sell accounts so that merchants can use them to make purchases and leave positive reviews."[24] Often, merchants use Facebook groups to incentivize fake reviews. Again, according to the *Wall Street Journal*, "Sellers, often out of China, post about free products, say Bluetooth headphones. The buyer gets the Amazon link from the seller via direct message, orders the headphones through Amazon so it can appear as a 'Verified Purchase,' then writes the review, posts some photos and rates it five stars. Once proof of purchase is provided, the seller refunds the buyer, generally via PayPal."[25]

---

[22] Some Amazon Sellers Are Paying $10,00 A Month To Trick Their Way To The Top (Leticia Miranda. April 24, 2019) https://www.buzzfeednews.com/article/leticiamiranda/amazon-marketplace-sellers-black-hat-scams-search-rankings (Nov. 12, 2021).

[23] *Id.*

[24] How Sellers Trick Amazon to Boost Sales (Laura Stevens. July 28, 2018) https://www.wsj.com/articles/how-sellers-trick-amazon-to-boost-sales-1532750493 (Last visited Nov. 12, 2021).

[25] Is It Really Five Stars? How to Spot Fake Amazon Reviews (Joanna Stern. Dec. 20, 2018) https://www.wsj.com/articles/is-it-really-five-stars-how-to-spot-fake-amazon-reviews-11545314400 (Last visited Nov. 12, 2021).

FIRST AMENDED COMPLAINT

96.    Nor do sellers rely solely on fake reviews. Simply clicking to indicate that a particular review (whether bona fide or fabricated) was "Helpful" pushes that review higher for the product in question. As BuzzFeed reported, sellers "hire people to hit the 'Helpful' button on a review so that it appears first" among reviews.[26]Amazon agrees that the use of fake "Helpful" votes "improperly manipulate[s] the published ratings and rankings of products listed for sale in Amazon's stores[.]"[27]

97.    In the fall of 2019, Amazon launched its one-tap rating system, which allowed customers to submit a product star rating without accompanying review text. These ratings also increase sales. As the *New York Times* reported, an increase a single "star" in an Amazon product rating "correlates with a 26 percent increase in sales, according to a recent analysis by the e-commerce consulting firm Pattern."[28]

98.    An August 2021 paper published by researchers at UCLA and USC concluded that "rating manipulation has a large causal effect on sales."[29] The authors found that when firms stopped using fake reviews, their average ratings fell, the share of one-star reviews increased significantly, thus indicating that rating manipulation "is deceiving and harming consumers." The study observed "a substantial increase in search position and sales rank" in the period after sellers purchase fake reviews and found that the false ratings evidence "primarily supports the consumer harm view."[30]

99.    The academic study concludes that in addition to harming consumers, "rating manipulation likely harms honest sellers and the platform's reputation itself." If consumers become more skeptical of new and highly rated products, "[t]his, in turn, would make it harder for new, high-quality sellers to enter the market and would likely reduce innovation."[31]

---

[26] Here's Another Kind Of Review Fraud Happening On Amazon (Nicole Nguyen. May 29, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-review-reuse-fraud (Last visited Nov. 12 2021).

[27] *See* Amztrustedreview Complaint, ¶¶ 7, 20-22.

[28] When Is a Star Not Always a Star? When It's an Online Review (Sapna Maheshwari. Nov. 28, 2019) https://www.nytimes.com/2019/11/28/business/online-reviews-fake.html (Nov. 12, 2021).

[29] *See* Sherry He, Brett Hollenbeck, and Davide Proserpio, The Market for Fake Reviews (Aug. 2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3664992 (last visited Oct. 1, 2021).

[30] *Id.* at pp. 4-5.

[31] *Id.* at 53.

100.     A recent *Wall Street Journal* story addressed seller tactics similar to those employed by Defendants as recounted above. It noted that some sellers track down customers who leave negative feedback on Amazon listings and pester—or bribe—them to delete or change those reviews. One seller sent multiple messages to a consumer's personal email after the consumer left a two-star review for a $17 finger brace, offering "escalating monetary incentives to delete the [negative] review, from $10 to finally $40."[32] Another *Wall Street Journal* article described a seller's offer "We are willing to refund in full," and "We hope you can reconsider deleting comments at your convenience okay?" When the consumer requested a refund but did not want to delete her review, another representative refused to provide the refund. A refund of $20 (twice the amount the customer paid) was offered if only the review would be deleted. Amazon's terms of service prohibit sellers from requesting that a customer remove a negative review or post a positive one.[33]

101.     Paying for reviews or paying consumers to change or delete negative reviews are not the only tactics sellers use to falsely portray products. When a product is new to the market, it begins with no sales or review history upon which to rely. As BuzzFeed News again observed, unscrupulous sellers "take an existing product page, then update the photo and description to show an entirely different product. By retaining all the existing reviews, the new product looks more tested and legitimate to shoppers – and in the world of online reviews, quantity is key. More ratings make a product appear to be more well-reviewed and, ultimately, boosts sales." A Federal Trade Commission representative confirmed that "it's deceptive to misrepresent that reviews for one product apply to a different product."[34]

102.     This method of deception is sometimes called "brushing." The *Wall Street Journal* chronicled a blackhead-remover mask from a merchant that Amazon listed as "just launched," that

---

[32] Fake Reviews and Inflated Ratings Are Still a Problem for Amazon (Nicole Nguyen. June 13, 2021) https://www.wsj.com/articles/fake-reviews-and-inflated-ratings-are-still-a-problem-for-amazon-11623587313 (Last visited Nov. 12, 2021).

[33] When Amazon Customers Leave Negative Reviews, Some Sellers Hunt Them Down (Nicole Nguyen. Aug. 8, 2021) https://www.wsj.com/articles/when-amazon-customers-leave-negative-reviews-some-sellers-hunt-them-down-11628420400 (Last visited Nov. 12, 2021).

[34] Here's Another Kind Of Review Fraud Happening On Amazon (Nicole Nguyen. May 29, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-review-reuse-fraud (Last visited Nov. 12, 2021).

already had hundreds of reviews, averaging 4.3 stars. However, only the first four reviews related to the mask, while all of the others evaluated a battery charger. According to the *Journal*, the seller "likely co-opted an old listing with positive reviews and changed the product's image and description to fool Amazon's algorithms, according to sellers and consultants familiar with this general practice."[35]

103.    The practices that succeed in inflating sales are the types of deceptive practices engaged in by the Defendants. Those practices have been successful in inflating Defendants' sales at the expense of sales by Plaintiff.

### D.    False Reviews and Sales Rank Manipulation Are Deceptive and Unfair Methods of Competition

104.    The practices engaged in by Defendants and complained of throughout this Complaint have been deemed deceptive and unfair methods of competition.

105.    In 2019, the Federal Trade Commission (FTC) filed a lawsuit against a company that allegedly paid a third party to generate false reviews and inflated star ratings for its product, which was sold exclusively on Amazon.[36] The FTC asserted that these fabricated reviews constituted "unfair or deceptive acts or practices in or affecting commerce," in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

106.    The case was resolved within a week, with the seller-defendant agreeing to injunctive relief and a $12.8 million judgment. Andrew Smith, Director of the FTC's Bureau of Consumer Protection, said in a statement: "People rely on reviews when they're shopping online[.] When a company buys fake reviews to inflate its Amazon ratings, it hurts both shoppers and companies that play by the rules."[37]

---

[35] How Sellers Trick Amazon to Boost Sales (Laura Stevens. July 28, 2018) https://www.wsj.com/articles/how-sellers-trick-amazon-to-boost-sales-1532750493 (Last visited Nov. 12, 2021).

[36] *Federal Trade Commission v. Cure Encapsulations, Inc., et al.*, No. 19-cv-982 (E.D.N.Y.).

[37] Feb. 26, 2019 FTC Press Release, available at https://www.ftc.gov/news-events/press-releases/2019/02/ftc-brings-first-case-challenging-fake-paid-reviews-independent (last viewed Nov. 12, 2021).

107.    Seller conduct on the Amazon marketplace is governed by Amazon's rules. First and foremost, the Amazon seller code of conduct requires that all sellers must "provide accurate information to Amazon and our customers at all times." This means that sellers "must use a business name that accurately identifies your business…."

108.    Sellers must also "not attempt to influence customers' ratings, feedback and reviews." In particular, the seller code of conduct prohibits sellers from "send[ing] unsolicited or inappropriate communications" or "contact[ing] customers" except through Amazon's Buyer-Seller Messaging system (which does not share buyer direct contact information with sellers).

109.    The Amazon seller code of conduct specifically states that "Examples of unfair activities include: Manipulating sales rank (such as by accepting fake orders or orders that you have paid for)." Amazon's rules dictate, among other things, that "[a]ny attempt to manipulate reviews, including by directly or indirectly contributing false, misleading or inauthentic content, is strictly prohibited" on the Amazon online platform.[38]

110.    Further directives specify that sellers "may not attempt to influence or inflate customers' ratings, feedback, and reviews," and may not "pay for or offer an incentive (such as coupons or free products) in exchange for providing or removing feedback or reviews." Sellers may not ask customers to remove or change a review.[39]

111.    The seller code of conduct also indicates that sellers must "not operate more than one selling account on Amazon without a legitimate business need." Amazon's Selling Policies and Seller Code of Conduct restrict sellers from operating multiple selling accounts. Absent a "legitimate business need," a seller may maintain only one Seller Central account for each region in which it sells. Owning multiple brands is a "legitimate business justification" only if the seller maintains separate businesses for each.

---

[38] Anti-Manipulation Policy for Customer Reviews, AMAZON https://www.amazon.com/gp/help/customer/display.html?nodeId=201996120#:~:text=Reviews%20provide%20a%20forum%20for,our%20reviews%20platform%20very%20seriously. (last visited Nov. 12, 2021).

[39] *Id.*

112.    Defendants' blatant and consistent violation of the Amazon rules, which are designed to provide consumers with honest information and secure a fair playing field for honest competition, is unlawful under the Lanham Act and California law as asserted below.

113.    On October 13, 2021, the Federal Trade Commission issued a warning to hundreds of businesses about fake reviews and misleading product endorsements. The FTC outlined seven practices that it considers deceptive or unfair conduct:

- It is an unfair or deceptive trade practice to make claims which represent, expressly or by implication, that a third party has endorsed a product or its performance when such third party has not in fact endorsed such product or its performance.

- It is an unfair or deceptive trade practice for an advertiser to misrepresent that an endorsement represents the experience, views, or opinions of users or purported users of the product.

- It is an unfair or deceptive trade practice to misrepresent an endorser as an actual user, a current user, or a recent user of a product or service.

- It is an unfair or deceptive trade practice for an advertiser to continue to advertise an endorsement unless the advertiser has good reason to believe that the endorser continues to subscribe to the views presented in the endorsement.

- It is an unfair or deceptive trade practice for an advertiser to use testimonials to make unsubstantiated or otherwise deceptive performance claims even if such testimonials are genuine.

- It is an unfair or deceptive trade practice to fail to disclose a connection between an endorser and the seller of an advertised product or service, if such a connection might materially affect the weight or credibility of the endorsement and if the connection would not be reasonably expected by consumers.

- It is an unfair or deceptive trade practice to misrepresent explicitly or implicitly through the use of testimonials that the experience described by endorsers of a product or service represents the typical or ordinary experience of users of the product or service.

Each of the Defendants operate or have operated in a manner that would be considered deceptive or unfair conduct under the FTC warning letter.

114.    On or about July 31, 2023, the FTC commenced a rulemaking to promulgate a trade regulation rule entitled "Rule on the Use of Consumer Reviews and Testimonials" (hereafter the "Rule," available at Fed. Reg. Vol. 88, No. 145 (July 31, 2023)[40]). In particular, FTC proposed to amend title 16 C.F.R. ch. I, subch. D to add the Rule as Part 465. The rulemaking is based on the FTC's conclusions that fake consumer reviews, the "unfair or deceptive reuse or repurposing of consumer reviews" and the "giving of incentives for reviews" all are "prevalent." Fed. Reg. Vol. 88, No. 145 at p. 49373, 49374. Accordingly, proposed Rule 465 would proscribe:

- as "an unfair or deceptive act or practice … for a business to purchase a consumer review, or to disseminate or cause the dissemination of a consumer testimonial" when the business knows or should know that the review involves a reviewer "who does not exist," who "did not use or otherwise have experience with the product," or when it "materially misrepresents … the reviewer's experience with the product." (Rule 465.2(b));

- as "an unfair or deceptive act or practice" a business's procurement of the same types of false reviews "for posting on a third-party platform or website." (Rule 465.2(c)); and

- as "an unfair or deceptive act or practice" the "use or repurpos[ing of] a consumer review written or created for one product so that it appears to have been written or created for a substantially different product, or to cause such use or repurposing." (Rule 465.3.)

115.    The Rule is designed to allow FTC "to more effectively police harmful review and testimonial practices that plague consumers and honest businesses." *Id.* at p. 49378. FTC opines that the Rule will generate benefits "related to competition." In particular, "fake online reviews allow companies

_____

[40] A copy was previously filed as Exhibit 1 to the Declaration of Leigh M. Perica (Dkt. 145-1) accompanying Plaintiff's August 23, 2023 Second Notice of Supplemental Authority (Dkt. 144) in case *ML Products v. Ninestar Technology Co., Ltd., et al*., No. 21-cv-1930-MEMF-KK.

to surpass competitors" and "by curbing the number of fake or manipulated reviews, the proposed Rule would benefit consumers by improving the competitive environment for legitimate firms selling higher-quality products (*i.e.*, those who do not rely on review manipulation to sell their goods)." *Id.* at p. 49385. The Rule addresses the FTC's conclusion that using or procuring fake reviews or repurposing of reviews for unrelated products is both "deceptive" and constitutes an "unfair" practice, violating the policy or spirit of the FTC Act, 15 U.S.C. 45(a)(1).

### E.    ML Products' Injury

116.    ML Products is an online distributor and retailer based in Los Angeles, California that has sold various kinds of toner and ink since 1999, making sales to wholesalers, retailers, and consumers. ML Products began selling third-party private label ink and toner on Amazon in 2018 and has continued to sell these products on Amazon since that time, in direct competition with Defendants.

117.    ML Products has a lengthy track record as a successful toner and ink supply company over its 20-plus year existence. Prior to 2018, ML Products focused on direct to consumer sales of ink and toner. As the Amazon market became more and more powerful, and as more consumers flocked to Amazon as the starting place for search and the go-to marketplace for anything, a selling presence on Amazon became a commercial necessity for online retail sales.

118.    ML Products identified high-demand ink and toner cartridges and was quick to the market, initially establishing itself as one of the top 1 percent of all Amazon sellers that cross the $1 million mark in yearly sales.[41] At that time, ML Products quickly rose to the top of Amazon's organic listings for large market inks and toners and had instant success. While ML Products has continued to grow its Amazon sales revenues each year since, with an average growth of approximately 33% year-over-year, its search rankings quickly dropped due Defendants' conduct as described herein.

119.    ML Products attempted to compete with Defendants through a combination of sponsored ads and regular listings, but simply could not compete on the products that Defendants decided to sell. Without engaging in the same conduct as Defendants—*i.e.*, false reviews and ratings and crowding the field with multiple shell company sellers under the control of and for the benefit of a single entity—

---

[41] https://landingcube.com/amazon-statistics/

honest sellers like ML Products are unable to earn the top organic search results and thus unable to compete with Defendants who thereby dominate third-party sales of replacement ink and toner.

120.    Unable to compete in the lucrative high volume toner and ink cartridges that comprise most of the market, ML Products has been forced to concentrate on sales of smaller, niche ink and toner products that are not worth Defendants deceptive marketing and cheating efforts.

121.    Absent Defendants' conduct as complained of herein, ML Products would have continued to succeed in sales of high-demand ink and toner cartridges as it set out to do and would have won a substantial portion of the sales for ink and toner cartridges that Defendants have sold since that time.

122.    The Defendants, through the tactics described in this complaint, do not merely dominate the existing market but they also foreclose the entry by honest sellers into that market, as honest sellers simply cannot compete with the unlawful tactics employed by Defendants.

123.    ML Products has suffered, and will continue to suffer, injury as a direct, foreseeable, and proximate result of Defendants' conduct.

### V.

### CLAIMS FOR RELIEF

### COUNT I
### Violations of the Lanham Act (All Defendants)
### (15 U.S.C. § 1051 et seq.)

124.    Plaintiff incorporates by reference and re-alleges all paragraphs previously stated herein.

125.    Defendants, in connection with their products sold in interstate commerce have made and continue to make false statements of fact and false representations of fact as to the nature, characteristics, and quality of its products.

126.    Defendants have introduced their false and misleading statements into interstate commerce via marketing and false reviews on the Amazon.com online sales platform.

127.    Defendants' false and misleading statements of fact and misrepresentations of fact concerning its products were made, and continue to be made, in commercial advertising, promotions, and direct communications with consumers on the Amazon.com online sales platform in a manner material

to the public's decision to purchase Defendants' products instead of those of their competitors, including Plaintiff.

128.    Defendants' false statements of fact and false representations of fact in promoting their products are false and misleading in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

129.    Defendants' false and misleading statements include fake customer reviews and promotional tactics and materials that Defendants have placed into interstate commerce in connection with the marketing of their products on the Amazon.com online sales platform.

130.    The above-described acts of Defendants actually deceived, or have the tendency to deceive, a substantial segment of consumers who see or read such representations and reviews on the Amazon.com online sales platform.

131.    The above-described acts of Defendants are material, in that they are likely to influence a consumer's purchasing decision.

132.    Plaintiff directly competes with Defendants in the consumer replacement ink and toner industry.

133.    As demonstrated above, Defendants have intentionally and materially participated in a false and misleading campaign to promote and sell their products on the Amazon.com online sales platform.

134.    Defendants have competed unfairly with Plaintiff by manipulating Amazon's customer review system as described herein.

135.    As a result of Defendants' false and misleading advertising, Plaintiff has suffered a direct diversion of customers to Defendants and has been and will be deprived of substantial revenue in an amount to be determined at trial.

136.    Defendants have caused, and will continue to cause, immediate and irreparable injury to Plaintiff, including injury to its business, for which there is no adequate remedy at law. As such, Plaintiff is entitled to an injunction under 15 U.S.C. § 1116 restraining Defendants, their agents, employees, representatives and all persons acting in concert with them from engaging in further acts in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and ordering removal of all of Defendants' false advertising and falsely advertised product listings.

137.    Plaintiff is entitled under 15 U.S.C. § 1117 to actual damages to be determined at trial, to have such damages trebled, to disgorgement of Defendants' profits, and costs of the action.

138.    Defendants have acted in bad faith and have knowingly, willfully, and deliberately engaged in false advertising with the intent to deceive the public and injure their competitors, including Plaintiff. Thus, in addition to the relief requested herein, Plaintiff is entitled to reasonable attorney's fees pursuant to 25 U.S.C. § 1117(a).

**COUNT II**
**Violation of California Unfair Competition Law Section 17200**
**(All Defendants)**
**(Cal. Bus. & Prof. Code § 17200, *et seq*.)**

139.    Plaintiff incorporates by reference and re-alleges all paragraphs previously stated herein.

140.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

141.    Amazon's platforms are used in interstate commerce and throughout the world for the purposes of commercial advertising and promotion. Defendants have engaged in unlawful, unfair and fraudulent conduct by way of their false, deceptive, and misleading marketing, advertising, reviews and sale of their ink products on Amazon's online sales platforms. In particular, Defendants falsely represent to consumers that their reviews and ratings are legitimate, when in fact Defendants employ fake product reviews; compensation to customers for positive product reviews or removal of negative product reviews; "ghost" accounts to manufacture the false impression of interest in, or sales of, products; manipulation of the "helpful" voting for the (likely false) positive reviews of Defendants' products; review repurposing, including the recycling of old product ASINs (and their accompanying review history) for use with new product offerings and creating false product "variations" to share in ratings, reviews, and status; and Defendants' use of multiple seller accounts offering the same products to ensure the search results list their products as top products.

142.    Defendants' actions set forth herein constitute intentional business acts and practices that are unlawful, unfair, and fraudulent, including Defendants' manipulation of Amazon's customer review system and organic search algorithm.

FIRST AMENDED COMPLAINT

143. As demonstrated above, Defendants violated the Unfair Competition Law by making and continuing to make representations about their ink products that are clearly false and misleading, and Defendants have engaged in unlawful, unfair and fraudulent conduct by way of their false, deceptive, and misleading statements of fact and representations of fact as to the nature, characteristics, and quality of their products and product reviews to boost sales on Amazon.

144. Defendants are likely to cause confusion, mistake, and deception as to the nature, characteristics, and quality of their products due to Defendants' manipulation of Amazon's customer review system and organic search algorithm.

145. Plaintiff directly competes with Defendants in the consumer replacement ink and toner industry.

146. By reason of Defendants' acts of unfair competition, Plaintiff has suffered and will continue to suffer irreparable injury unless and until this Court enters an order enjoining Defendant from any further acts of unfair competition. Defendant's continuing acts of unfair competition, unless enjoined, will cause irreparable damage to Plaintiff in that he will have no adequate remedy at law to compel Defendants to cease such acts, and no way to determine his losses proximately caused by such acts of Defendant. Plaintiff is therefore entitled to a preliminary injunction and a permanent injunction against further unlawful, unfair, and fraudulent conduct by Defendants, as well as removal of all of Defendants' false advertising and falsely advertised product listings.

147. As a direct and proximate result of Defendants' acts of unfair competition, Defendant has wrongfully taken Plaintiff's profits and sales, as well as his substantial investment of time, energy and money.

**COUNT III**
**Violation of California False Advertising Law (All Defendants)**
**(Cal. Bus. & Prof. Code § 17500, *et seq*.)**

148. Plaintiff incorporates by reference and re-alleges all paragraphs previously stated herein.

149. California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or

disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

150. Defendants violated Business and Professions Code section 17500 by making or disseminating, or causing to be made or disseminated, before the public in this State, deceptive, untrue or misleading statements in connection with the sale of goods on Amazon's online sales platforms, that Defendants knew, or in the exercise of reasonable care should have known were deceptive, untrue or misleading concerning the sale of Defendants' product and were likely to mislead or deceive a reasonable consumer.

151. For example, and without limitation, Defendants purposely made false and misleading statements through the manipulation of customer product reviews and the creation of false product reviews to boost Defendants' profiles and sales on Amazon. Plaintiff directly competes with Defendants in the consumer replacement ink and toner industry.

152. Defendants are likely to cause confusion, mistake, and deception as to the nature, characteristics, and quality of their products due to Defendants' manipulation of Amazon's customer review system and organic search algorithm.

153. By reason of Defendants' deceptive, untrue, and misleading advertising, Plaintiff has suffered and will continue to suffer irreparable injury unless and until this Court enters an order enjoining Defendants from any further acts of deceptive, untrue, and misleading advertising. Defendants' continuing acts of deceptive, untrue, and misleading advertising, unless enjoined, will cause irreparable damage to Plaintiff in that he will have no adequate remedy at law to compel Defendants to cease such acts, and no way to determine his losses proximately caused by such acts of Defendants. Plaintiff is therefore entitled to a preliminary injunction and a permanent injunction against further deceptive, untrue, and misleading advertising by Defendants, as well as removal of all of Defendants' false advertising and falsely advertised product listings.

154.    As a direct and proximate result of Defendants' acts of deceptive, untrue, and misleading advertising, Defendants have wrongfully taken Plaintiff's profits and his substantial investment of time, energy and money.

155.    Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in California which, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of their products in violation of the False Advertising Law at Business & Professions Code § 17500, et seq.

## COUNT IV
### Civil Conspiracy under California Law (All Defendants)

156.    Plaintiff incorporates by reference and re-alleges all paragraphs previously stated herein.

157.    Defendants entered into an illicit agreement and conspiracy to, *inter alia*, make false statements concerning their ink and toner products sold on Amazon, including the use of fake product reviews, compensating customers to change or remove negative reviews, undisclosed compensation to customers for positive reviews, attributing reviews and ratings of products to other products to which they do not belong, and other conduct as described herein.

158.    Defendants agreement and conspiracy sought to manipulate the Amazon search results algorithm and to falsely advertise their ink and toner replacement cartridges for financial gain.

159.    Defendants received financial gain as a result of their conspiracy.

160.    Defendants' above-described actions and wrongful activities constitute a civil conspiracy to commit in cooperation with each other, the false and unlawful conduct alleged herein, in violation of California law, all to the damage of Plaintiff as alleged herein.

## V.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Damages under the aforesaid causes of action in the form of actual, damages, disgorgement of Defendants' profits, and an award of enhanced or treble damages, in an amount to be determined at trial;

B.  An Order preliminarily and permanently enjoining Defendants from engaging in the false and unlawful conduct described in this lawsuit and removing all false advertising and all of Defendants' falsely advertised product listings

C.  An Order requiring Defendants to pay both pre and post judgment interest on any amounts awarded to the extent allowed by law;

D.  An award of reasonable attorney's fees and costs of suit incurred herein;

E.  Any further relief as the Court deems appropriate.

## VII.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury for all issues so triable.

DATED: April 21, 2025                    Respectfully Submitted,

**MCCUNE LAW GROUP, APC**

*/s/ Dana R. Vogel*

Dana R. Vogel (*Pro Hac Vice*)
Connor P. Lemire (*Pro Hac Vice*)
2415 East Camelback Road, Suite 850
Phoenix, Arizona 85016
Telephone: 909-557-1250
drv@mccunelawgroup.com
cpl@mccunelawgroup.com

Richard D. McCune
Valarie L. Savran
3281 E. Guasti Road, Suite 100
Ontario, CA 91761
T: (909) 557-1250
rdm@mccunelawgroup.com
vs@mccunelawgroup.com

*Attorneys for Plaintiff*

FIRST AMENDED COMPLAINT